403 So.2d 660 (1981)
STATE of Louisiana
v.
Arthur PRICE.
No. 80-KA-2616.
Supreme Court of Louisiana.
September 8, 1981.
*661 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Abbott J. Reeves, William W. Hall, Asst. Dist. Attys., for plaintiff-appellee.
Robert Garrity, New Orleans, Indigent Defender Bd., for defendant-appellant.
DIXON, Chief Justice.
Defendant was convicted of armed robbery (R.S. 14:64) and was sentenced to thirty years imprisonment at hard labor without benefit of probation, parole or suspension.
The chief issue in this appeal is whether defendant successfully presented a defense of insanity.[1] For the purposes of *662 criminal liability, insanity is defined as a mental disease or defect that renders a person "incapable of distinguishing between right and wrong with reference to the conduct in question." R.S. 14:14. A defendant is entitled to a verdict of not guilty by reason of insanity if it is proved, by a preponderance of the evidence, that he was insane at the time of the offense. C.Cr.P. 652. Defendant contends that he met his burden of proof, and that the jury's unanimous verdict was contrary to the evidence.

I
In reviewing such claims of insufficiency of evidence in regard to a defense of insanity, this court has applied the test established in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in accord with the rule announced in Moore v. Duckworth, 443 U.S. 713, 99 S.Ct. 3088, 61 L.Ed.2d 865 (1979). See State v. Liner, 397 So.2d 506 (La.1981); State v. Hathorn, 395 So.2d 783 (La.1981); State v. Claibon, 395 So.2d 770 (La.1981); State v. Roy, 395 So.2d 664 (La.1981). Under the Jackson standard, the test is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude that the crime was proved beyond a reasonable doubt. When this standard is applied to the review of evidence adduced in support of the defense of insanity, which is the defendant's burden to prove, the question becomes whether any rational fact finder, viewing the evidence in the light most favorable to the prosecution, could find, beyond a reasonable doubt, that the defendant failed to present a preponderance of proof in support of the defense. That is, a defendant might fail to adduce any proof in support of the defense, or the prosecution might effectively rebut any evidence presented.
Only two witnesses testified in defendant's behalf: Mrs. Jones, defendant's foster mother, and Dr. Arneson, a psychiatrist. Mrs. Jones, who had raised defendant since his infancy, reported that defendant's behavior had become erratic in the months prior to the robbery: he withdrew from his friends and family and remained secluded in his room; he refused to engage in conversation; he lost his appetite; and he took long walks alone. She also testified that defendant had left one job, stating that his nerves were upset, and that he never stayed on other jobs longer than a few days. Dr. Arneson, accepted as an expert witness in the field of psychiatry, had examined defendant on four occasions. She declared that defendant was psychotic, and suffered from manic-depressive episodes. According to Dr. Arneson, this condition causes extreme changes of mood: the person who suffers from such an affliction alternates between periods of deep depression and withdrawal to periods of high excitement and manic behavior. After hearing Mrs. Jones' testimony, Dr. Arneson concluded that defendant's emotional state was probably in the latter extreme when the robbery occurred, and that he was operating under a grandiose delusion. Dr. Arneson affirmatively stated that, considering defendant's probable mental condition at the time the *663 crime was committed, he would not have known the difference between right and wrong "in the usual sense."
On cross-examination, Dr. Arneson explained:
"I would say when a patient is in a manic episode they exhibit what we call grandiosity, they feel they can get away with or do anything. You know, some say they can fly or jump out the window, that sort of thing. And, I think that Mr. Price was high and he was excited and he felt that he could probably do this and he was having some financial difficulty or something, and he just went ahead, in a very psychotic manner, went ahead to rob this bank."
As to determining the difference between right and wrong, Dr. Arneson stated that psychotic individuals usually are affected by a "delusion that they can do anything and it is not wrong because they are so powerful and so on. In this sense they don't appreciate right from wrong in the ordinary every day way."
The prosecution presented no expert testimony to contradict the defense of insanity. However, the prosecution did rely upon the factual circumstances of the case to rebut Dr. Arneson's conclusions.
Defendant robbed the bank with a kitchen knife, jumping over a counter and taking cash from a teller's drawer. In removing one stack of bills, defendant picked up and then replaced a device (known as "bait money") which, although disguised as money, actually contains a package of dye designed to explode if removed from the bank. The teller testified that defendant told her to be quiet and not to move, and that he did not want to have to hurt anyone. After defendant took the money from the drawer, he again leaped over the counter and reportedly repeated his statement that he did not want to hurt anyone.
Defendant was apprehended a short while later at his home. He had stuffed a paper bag containing the money into a hole in the ceiling. Defendant told the police that the money was his savings.
Despite Dr. Arneson's assertion that these facts did not change her opinion of defendant's insanity at the time of the offense, the facts did provide the jury with a number of reasons for concluding that defendant was not insane, and that he was aware that what he was doing was "wrong." It ought to be noted that, in the jurisprudence of this state, there is some confusion as to whether the terms "right" and "wrong," as used in R.S. 14:14, refer to legal or moral values. See State v. Abercrombie, 375 So.2d 1170 (La.1979). There has also been substantial criticism of the century old rule defining legal insanity in terms of a defendant's perception of right and wrong. It is thought that the rule is outmoded in terms of the present state of medical knowledge concerning insanity, and that the terminology of the rule is essentially meaningless. See, e. g., LaFave & Scott, Criminal Law, § 37 at 280-83 (1972); McNamara, "The Insanity Defense in Louisiana," 12 Loy.L.Rev. 19 (1965-66); Morrow, "Louisiana Criminal Code," 17 Tul.L. Rev. 1, 15-17 (1942); Comment, "Legal Insanity and the Law of Crimes," 29 Tul.L. Rev. 576 (1955).
In the present case, defendant proved by a preponderance of evidence that he suffered from a mental disease or defect. His criminal conduct was perhaps prompted by his mental condition. However, viewing the evidence in the light most favorable to the prosecution, the record belies the assertion that defendant was not aware of the criminality of his actions, and that defendant's mental status prevented him from being aware that his conduct was forbidden by society both legally and "morally." At least two points are significant. First, defendant's deliberate refusal to take the "bait money" allows the inference that he understood that the money could foil the crime. This inference supports the finding that defendant knew that his actions were outlawed, and was anxious to avoid detection or capture. Second, defendant stated that he did not want to hurt anyone, which signals at least a rudimentary value system on his part, representing a choice between "right" and "wrong." Given these facts, a *664 rational jury could have concluded that the defense of insanity was not proved by a preponderance of the evidence. Moreover, Dr. Arneson characterized defendant's mental illness as causing delusions in defendant that he could "get away with or do anything." Such a delusion does not necessarily negative an awareness that what is done is not socially or legally permissible, and cannot necessarily be interpreted as removing the feature of deliberate defiance that marks a criminal act.

II
Defendant's final assignment of error is that his thirty year sentence of imprisonment is excessive. The sentence is within the statutory limits of R.S. 14:64 (which establishes a minimum of five and a maximum of ninety-nine years imprisonment) and conforms with the statute's dictate that no "parole, probation or suspension of sentence" can be allowed.
Article 1, § 20 of the Louisiana Constitution of 1974 forbids excessive punishment. A trial judge must state for the record "the considerations taken into account and the factual basis therefor in imposing sentence." C.Cr.P. 894.1(C). The purpose of this provision is to afford a reviewing court some insight into the reasoning process of the trial judge, so that the propriety of the sentence can be better evaluated. When the trial judge does not comply with the provision, the sentence may be vacated and the case remanded for resentencing. See, e. g., State v. Cox, 369 So.2d 118 (La.1979); State v. Jackson, 360 So.2d 842 (La.1978). If, however, there is no apparent abuse of discretion in imposing sentence, this court may decline to remand the case for resentencing, even where the trial judge does not fully comply with the requirements of C.Cr.P. 894.1. See, e. g., State v. Davenport, 399 So.2d 201 (La.1981); State v. Day, 391 So.2d 1147 (La.1980); State v. MacDonald, 390 So.2d 1276 (La. 1980).
Accordingly, it must first be determined whether the trial judge satisfied the requirements of C.Cr.P. 894.1. In this regard, it should be noted that the trial judge was required to impose at least five years of imprisonment; there was no discretion to allow suspension or probation.
At the sentencing hearing, the trial judge mentioned three basic factors which he had considered: (1) that defendant's conduct threatened both life and property, and was a serious offense; (2) that no showing was made of any provocation; and (3) that defendant posed "a definite threat to society." In addition, the judge remarked to the defendant: "You had no explanation for your conduct except that you just were not in your right mind." In expressing these considerations, the trial judge negatived the presence of several mitigating factors enumerated in C.Cr.P. 894.1(B). At the same time, no mention was made of the considerations included in C.Cr.P. 894.1(B)(4), (7), (8) or (9), which appear to be highly relevant. Thus, although defendant failed to establish the defense of insanity, it could not be denied that proof was given that he suffered from a deranged mental condition; in fact, the court appointed sanity commission had initially found that defendant was not even capable of standing trial. It was not until after defendant responded to medical treatment that the trial took place. While defendant did not prove that he was legally insane when he committed the crime, there was certainly proof that he committed the offense under the influence of an abnormal mental state. This does not absolve defendant of criminal responsibility for his actions, but it does tend to excuse or explain his behavior. C.Cr.P. 894.1(B)(4). In addition, the trial judge did not mention whether defendant had ever committed another crime, but Mrs. Jones testified that defendant had always been a law-abiding individual. C.Cr.P. 894.1(B)(7). Finally, Dr. Arneson testified that there was every reason to believe that the prognosis for treating defendant's mental condition was favorable, since defendant had already responded affirmatively to medication. C.Cr.P. 894.1(B)(8), (9).
These factors should have been weighed before sentence was imposed. Even though *665 defendant did not prove his legal insanity at the time of the offense, the uncontroverted medical testimony indicated that defendant was psychotic, and that he probably would not have committed the crime but for his mental condition. As it appears that the mental condition can be treated and brought under control, it follows that a thirty year term of imprisonment is not indispensable for the protection of society.
We do not conclude, from the record before us, that the thirty year sentence was in fact excessive or grossly out of proportion to the severity of the crime. Compare State v. Williams, 397 So.2d 1287 (La.1981). But where, as here, the trial judge ostensibly ignored or discounted several important mitigating considerations without providing any reasons for doing so, and the sentence imposed is relatively harsh considering the circumstances of the offender's mental state, it is preferable to require a reexamination of the sentence.
For the reasons assigned, the defendant's conviction is affirmed, but the sentence is vacated, and the case is remanded for resentencing in a manner consistent with this opinion.
MARCUS and BLANCHE, JJ., concur in part and dissent in part and assign reasons.
WATSON, J., concurs in part and dissents in part, for reasons assigned by BLANCHE, J.
MARCUS, Justice (concurring in part and dissenting in part).
I concur in the affirmance of the conviction; however, I dissent from the reversal of the sentence and remand for resentencing.
BLANCHE, Justice (concurring in part, dissenting in part).
I concur in affirming the defendant's conviction but dissent from the majority's remand of the case to the trial court for resentencing.
The jury found defendant could distinguish right from wrong and was, therefore, fully responsible for the crime which he committed. For a person fully responsible for committing the armed robbery of a bank, this writer believes that thirty years is a moderate sentence when it is considered that the defendant could have been sentenced to ninety-nine years without the benefit of parole, probation or suspension of sentence.
Further, this writer disagrees that the defendant proved a deranged mental condition but, assuming arguendo that one here was proved, it should be considered as an aggravating circumstance rather than one in mitigation. Proof of a mental condition as described by the psychiatrist is the type of mental propensity against which society should be protected.
NOTES
[1] Three other assignments of error were raised in this appeal. The first two involve defendant's competence to stand trial and a motion for continuance requesting additional evaluation by the sanity commission. The record discloses that the physicians on the sanity commission examined defendant the first time in November, 1977 and pronounced him incapable of standing trial. He was committed to East Louisiana State Hospital for treatment. Defendant was again examined in October, 1978 and was found competent. The trial judge then ordered that defendant be given no further medication (chlorpromazine). Defendant was reexamined in November, 1978 and the sanity commission again reported that he was competent to stand trial. In January, 1979, at defendant's motion, another examination was conducted by Dr. Arneson, a psychiatrist serving on the sanity commission, who found defendant's mental status to be normal. Finally, on the day of trial, defense counsel requested a continuance to obtain further evaluation. The trial judge refused this motion, but allowed defendant to testify for the purpose of evaluating his mental status. The transcript of this proceeding fully supports the finding that defendant understood the charge and the nature and gravity of the offense; that he was aware of his various rights; that he could recall events pertinent to the crime; and that he was able to assist his counsel. Psychological reports had indicated that defendant's intelligence was better than average. The trial judge exercised sound discretion in considering all the evidence before determining that defendant could proceed to trial. State v. Holmes, 393 So.2d 670 (La.1981); State v. Bennett, 345 So.2d 1129 (La.1977). These assignments of error are without merit.

The third assignment of error concerns the admission into evidence of six photographs. The argument is made that a proper foundation was not established for the introduction of this evidence. This argument is meritless. The officer who took the pictures identified them at trial, and testified that they accurately depicted the scenes that he photographed. Other witnesses corroborated this testimony. Defense counsel's objection to the admission of the photographs on the grounds that no testimony was given as to how they were developed was properly denied.